## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (the "Agreement") is made and entered into on this 11 day of April, 2016 to be effective as of the Closing (hereafter defined), by and among Michael E. Steven, an individual and resident of Kansas (the "Selling Stockholder"), Mike Steven Motors, Inc., a Kansas corporation (the "Company"), Nevets, Inc., a Kansas corporation (herein "Nevets") and Brandon J. Steven, an individual, and his assigns (the "Buyer").

**WITNESSETH:**

**WHEREAS**, Company owns and operates an automobile dealership in Wichita, Kansas;

**WHEREAS**, Nevets owns the real property (the "Real Property") used in the operation of the Company's business and leases the same to the Company;

**WHEREAS**, Buyer is employed in the operation of Company's automobile dealership;

**WHEREAS**, the authorized capital stock of the Company consists of (i) Ten Thousand (10,000) shares of Class A common stock, of which Eighteen and 87/100 (18.87) shares are issued and outstanding in the name of the Buyer (representing Fifty-one percent (51%) of the issued and outstanding Class A common stock of the Company), and Eighteen and 13/100 (18.13) shares are issued and outstanding in the name of the Selling Stockholder (representing Forty-nine percent (49%) of the issued and outstanding Class A common stock of the Company), and (ii) Ten Thousand (10,000) shares of Class B common stock, none of which are issued or outstanding and all of which are held by the Company as treasury stock;

**WHEREAS**, the authorized capital stock of Nevets consists of One Hundred Thousand (100,000) shares of common stock, of which Thirty-five Thousand Seven Hundred (35,700) shares are issued and outstanding in the name of the Buyer (representing Fifty-One percent (51%) of the issued and outstanding common stock of Nevets), and Thirty-four Thousand Three Hundred (34,300) shares are issued and outstanding in the name of the Selling Stockholder (representing Forty-Nine percent (49%) of the issued and outstanding common stock of Nevets);

**WHEREAS**, Buyer's stock ownership in the Company and Nevets, as recited above, was acquired by Buyer from the Selling Stockholder pursuant to the terms of that certain Stock Purchase Agreement dated March 12, 2012, to be effective as of the 1st day of January, 2012 (the "2012 SPA");

**WHEREAS**, the purchase price paid by Buyer to the Selling Stockholder under the 2012 SPA to purchase Eighteen and 87/100 (18.87) shares of the Class A common stock of the Company and Thirty-five Thousand Seven Hundred (35,700) shares of the common stock of Nevets was, as described in Sections 1.1 and 1.2 of the 2012 SPA, Ten Million Dollars ($10,000,000), Three Million Dollars ($3,000,000) of which was paid in cash and the remaining Seven Million Dollars ($7,000,000) by delivery of a promissory note payable to the Selling Stockholder, with all of the Ten Million Dollar ($10,000,000) purchase price being allocated to the sale and purchase of the Eighteen and 87/100 (18.87) shares of the Class A common stock of the Company;

**WHEREAS**, effective January 1, 2012, Buyer and Selling Stockholder entered into that certain Stockholders' Agreement, which Stockholders' Agreement was amended, effective, January 1, 2012, by that certain First Amendment to Stockholders' Agreement (collectively the "Stockholders' Agreement");

**EXHIBIT A**

**WHEREAS**, the Stockholders' Agreement imposes certain restrictions on the right and ability of Buyer and the Selling Stockholder to transfer the stock of the Company and Nevets, except in accordance with the terms of the Stockholders' Agreement;

**WHEREAS**, and with reference to the rights and the obligations of the Buyer and Selling Shareholder described in Stockholders' Agreement (as the same may be modified hereby), Buyer desires to purchase the remaining Forty-nine (49%) of the Company Class A common stock from the Selling Stockholder, and the Selling Stockholder desires to sell Forty-nine percent (49%) of the Company Class A common stock to Buyer, subject to the terms and conditions hereinafter set forth; and

**WHEREAS**, and with reference to the rights and the obligations of the Buyer and Selling Shareholder described in Stockholders' Agreement (as the same may be modified hereby), Buyer desires to purchase the remaining Forty-nine (49%) of the Nevets common stock from the Selling Stockholder, and the Selling Stockholder desires to sell Forty-nine percent (49%) of the Nevets common stock to Buyer, subject to the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the foregoing, the mutual promises hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be bound, hereby covenant and agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF STOCK

**1.1 Company Stock.**

(a) Subject to the terms and conditions of this Agreement, the Selling Stockholder shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and accept from the Selling Stockholder, Eighteen and 13/100 (18.13) shares of the Company Class A common stock (the "Company Stock"), which shares constitute forty-nine percent (49%) of the issued and outstanding shares of Company Class A common stock, at the Purchase Price (defined hereafter), free and clear of all liens, security interests and encumbrances. At Closing (defined hereafter), the Selling Stockholder shall deliver to Buyer all stock certificates representing the Company Stock, endorsed by the Selling Stockholder for transfer to Buyer.

(b) As consideration for the sale, transfer, assignment, conveyance, and delivery of the Company Stock by the Selling Stockholder, Buyer shall pay the Purchase Price to the Selling Stockholder at Closing. Notwithstanding Sections 3.1(i) and 3.1(ii) of the Stockholders' Agreement, the "Purchase Price" means the sum of Ten Million Dollars ($10,000,000.00), which Purchase Price is the unadjusted Base Value established under Section 3.1 of the Stockholder's Agreement. The Purchase Price shall be paid to the Selling Stockholder by Buyer in immediately available funds.

**1.2 Nevets Stock.**

(a) Subject to the terms and conditions of this Agreement, the Selling Stockholder shall assign, transfer, convey and deliver to Buyer, and Buyer shall accept from the Selling Stockholder, Thirty Four Thousand Three Hundred (34,300) shares of Nevets common stock (the "Nevets Stock), which shares constitute forty-nine percent (49%) of the issued and outstanding shares of Nevets common stock, free and clear of all liens, security interests and encumbrances. At Closing, Selling Stockholder shall deliver to Buyer all stock certificates representing the Nevets Stock endorsed by the Selling Stockholder for transfer to Buyer.

(b)     Selling Stockholder and Buyer acknowledge and agree under section 3.2 of the Stockholders' Agreement that no additional consideration shall be paid by Buyer to the Selling Stockholder for the Nevets stock and one hundred percent (100%) of the Purchase Price shall be allocated to the sale and purchase of the Company Stock pursuant to Section 1.1 above.

## ARTICLE II
## CLOSING

**2.1     Closing**. It is understood and agreed between the parties hereto that time is of the essence of this Agreement and unless otherwise agreed to by the parties, closing of the transactions contemplated herein shall be held within fifteen (15) days following the date Toyota Motor Corporation approves the transaction contemplated pursuant to this Agreement (the "Closing") at the offices of Hinkle Law Firm LLC, 8621 East 21st Street North, Suite 200, Wichita, Kansas 67206. All proceedings to be taken and all documents to be executed and delivered by all parties at Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**2.2     Deliveries by Selling Stockholder and the Company**. At Closing, the Selling Stockholder shall deliver to deliver to Buyer the following items:

(a)     The stock certificate(s) representing the Company Stock, in each case duly endorsed or accompanied with duly executed stock powers attached in proper form for transfer to Buyer;

(b)     The stock certificate(s) representing the Nevets Stock, in each case duly endorsed or accompanied with duly executed stock powers attached in proper form for transfer to Buyer; and

**2.2     Deliveries by Buyer**.    At the Closing, Buyer shall deliver to Selling Stockholder the following items:

(a)     Ten Million Dollars ($10,000,000.00) in immediately available funds;

(b)     Certificates of the Secretary of State of the State of Kansas as to the good standing as of the most recent practicable date of Company in Kansas;

(c)     Certificates of the Secretary of Company, certifying (as of Closing) and attaching copies of the Articles of Incorporation and Bylaws of Company, all requisite resolutions or actions of each of Company's board of directors and stockholders, as applicable, approving the execution and delivery of this Agreement and other such agreements and documents necessary to be executed and delivered by Company, as applicable, and the consummation of the transactions contemplated hereby and certifying to the incumbency and signatures of the officers of Company executing this Agreement and other such related documents;

(d)     Certificates of the Secretary of State of the State of Kansas as to the good standing as of the most recent practicable date of Nevets in Kansas;

(e)     Certificates of the Secretary of Nevets, certifying (as of Closing) and attaching copies of the Articles of Incorporation and Bylaws of Nevets, all requisite resolutions or actions of each of Nevets' board of directors and stockholders, as applicable, approving the execution and delivery of this Agreement and other such agreements and documents necessary to be executed and delivered by Nevets, as applicable, and the consummation of the transactions contemplated hereby and certifying to the incumbency and signatures of the officers of Nevets executing this Agreement and other such related documents;

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLING STOCKHOLDER AS TO COMPANY AND NEVETS

The parties understand and recognize that Buyer has served as the General Manager of the Company since May 1, 2009 and has personal knowledge in the matters about which the Selling Stockholder is making representations and warranties. The following representations and warranties of Selling Stockholder as to the Company and Nevets are limited to the time period prior to May 1, 2009.

**3.1 Organization.**

(a) Company is duly organized, validly existing and in good standing under the laws of the State of Kansas and has all requisite corporate power and authority to own, operate and lease its properties and assets and to carry on its business as now being conducted.

(b) Nevets is duly organized, validly existing and in good standing under the laws of the State of Kansas and has all requisite corporate power and authority to own, operate and lease its properties and assets, including the Real Property, and to carry on its business as now being conducted.

**3.2 Authorization.** The execution, delivery and performance of this Agreement and of the agreements and instruments called for hereunder, and the consummation of the transaction contemplated hereby and thereby, has been duly and validly authorized by all necessary actions. This Agreement and each of the other agreements and instruments called for hereunder to which Company and Nevets are parties have been duly executed and delivered and constitute a valid and binding agreement and obligation, enforceable in accordance with their respective terms. Except as provided in this Agreement, Company and Nevets are not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement. Company and Nevets have made available to Buyer true, correct and complete copies of their respective Articles of Incorporation and Bylaws (as amended to the date hereof).

**3.3 Capitalization of Company.**

(a) The authorized capital stock of Company consists of Ten Thousand (10,000) shares of Class A common stock, of which Eighteen and 87/100 (18.87) shares are issued and outstanding in the name of the Buyer and Eighteen and 13/100 (18.13) shares are issued and outstanding in the name of the Selling Stockholder, and Ten Thousand (10,000) shares of Class B common stock, none of which are issued and outstanding. All the outstanding shares of common stock of Company have been duly authorized and are validly issued, fully paid and nonassessable, and are free of any preemptive rights in respect thereof. There are no (a) outstanding securities convertible or exchangeable into shares of capital stock of Company; (b) options, warrants, calls, subscriptions, conversion rights, exchange rights, purchase rights or other rights, agreements or commitments obligating Company to issue, transfer or sell any shares of its capital stock; or (c) voting trusts, proxies or other agreements or understandings to which Company is a party or by which Company is bound with respect to the voting, registration, transfer or other disposition of its shares of capital stock. There are no outstanding or authorized stock appreciation rights, phantom stock, profit participation or other similar rights with respect to Company. There are no bonds, debentures, notes or other indebtedness of Company having the right to vote (or convertible into securities having the right to vote) on any matters on which stockholders of Company may vote.

(b) The authorized capital stock of Nevets consists of One Hundred Thousand (100,000) shares of common stock, of which Thirty-five Thousand Seven Hundred (35,700) shares are issued and outstanding

in the name of the Buyer and Thirty-four Thousand Three Hundred (34,300) shares are issued and outstanding in the name of the Selling Stockholder.. All the outstanding shares of common stock of Nevets have been duly authorized and are validly issued, fully paid and nonassessable, and are free of any preemptive rights in respect thereof. There are no (a) outstanding securities convertible or exchangeable into shares of capital stock of Nevets; (b) options, warrants, calls, subscriptions, conversion rights, exchange rights, purchase rights or other rights, agreements or commitments obligating Nevets to issue, transfer or sell any shares of its capital stock; or (c) voting trusts, proxies or other agreements or understandings to which Nevets is a party or by which Nevets is bound with respect to the voting, registration, transfer or other disposition of its shares of capital stock. There are no outstanding or authorized stock appreciation rights, phantom stock, profit participation or other similar rights with respect to Nevets. There are no bonds, debentures, notes or other indebtedness of Nevets having the right to vote (or convertible into securities having the right to vote) on any matters on which stockholders of Nevets may vote.

**3.4 No Conflict**.

(a) Neither the execution and delivery of this Agreement by Company, nor the consummation by Company of the transactions contemplated hereby will (i) conflict with or result in a breach of any provisions of the Articles of Incorporation or Bylaws (or equivalent organizational documents) of Company, (ii) to Company's knowledge, constitute or result in the breach of any term, condition or provision of, or constitute a default under, or, except as otherwise provided herein, require any consent under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of a lien upon any property or assets of Company, pursuant to any material contract to which it is a party or by which it or any of its respective properties or assets are bound or (iii) to Company's knowledge, violate any order or law applicable to Company or by which any of its respective properties or assets are bound, except in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect to Company, taken as a whole.

(b) Neither the execution and delivery of this Agreement by Nevets, nor the consummation by Nevets of the transactions contemplated hereby will (i) conflict with or result in a breach of any provisions of the Articles of Incorporation or Bylaws (or equivalent organizational documents) of Nevets, or (ii) to Nevets' knowledge, constitute or result in the creation or imposition of a lien upon the Real Property or other assets of Nevets.

**3.5 Financial Statements**.

(a) The balance sheets and income statements of Company for the years ending December 31, 2013, December 31, 2014 and December 31, 2015 (collectively, the "Company Financial Statements") are attached hereto as Schedule 3.5(a) and made a part hereof for all purposes. To the knowledge of Selling Stockholder and Company, the Company Financial Statements and the books, records and accounts of Company are materially correct and accurately and fairly reflect the financial condition and affairs of Company.

(b) The balance sheets of Nevets for the years ending December 31, 2013, December 31, 2014 and December 31, 2015 (collectively, the "Nevets Financial Statements") are attached hereto as Schedule 3.5(b) and made a part hereof for all purposes. To the knowledge of Selling Stockholder and Nevets, the Nevets Financial Statements and the books, records and accounts of Nevets are materially correct and accurately and fairly reflect the financial condition and affairs of Nevets.

**3.6 Absence of Certain Changes. Intentionally Omitted.**

**3.7 Compliance with Laws; Permits.**

(a) To Selling Stockholder's and Company's knowledge, Company is in compliance in all material respects with all laws and orders applicable to the business except where non-compliance would not have a material adverse effect to Company. Company has not received any notification or communication from any governmental authority asserting that Company is not in compliance in any material respect with any law or order.

(b) To Selling Stockholder's and Company's knowledge, Company holds all permits issued or provided by governmental authorities under all laws that are necessary for the conduct of their businesses in substantially the manner as currently conducted.

(c) To Selling Stockholder's and Nevets' knowledge, the Real Property is in compliance in all material respects with all laws and orders applicable to the Real Property. Nevets has not received any notification or communication from any governmental authority asserting that the Real Property is not in compliance in any material respect with any law or order.

(d) To Selling Stockholder's and Nevets' knowledge, Nevets holds all permits issued or provided by governmental authorities under all laws that are necessary for the use of the Real Property as the Real Property is currently being used.

**3.8 Employee Benefit Plans.**

(a) Company has previously given or made available to Buyer copies of all pension, retirement, profit sharing, deferred compensation, stock option, employee stock ownership, severance pay, vacation, bonus or other incentive plan, all other written employee programs, arrangements or agreements, all medical, vision, dental or other health plans, all life insurance plans, and all other employee benefit plans or fringe benefit plans (collectively, the "Benefit Plans"). Attached hereto as Schedule 3.8 and made a part hereof by this reference is a complete and detailed description of the Benefit Plans.

(b) To the knowledge of Selling Stockholder and Company, all of the Benefit Plans and the related trusts comply in all material respects with and have been administered in substantial compliance with all applicable governmental laws, regulations and orders and there are no unresolved claims or disputes under the terms of, or in connection with, the Benefit Plans other than claims for benefits which are payable in the ordinary course, and no litigation has been commenced with respect to any Benefit Plan.

(c) Nevets has no Benefit Plans.

**3.9 Material Contracts. Intentionally Ommitted.**

**3.10 Absence of Undisclosed Liabilities.**

(a) Except as set forth on the Company Financial Statements, the Company's floor-plan lines of credit, and trade payables incurred in the ordinary course of business, neither Selling Stockholder nor Company have any actual knowledge of any material outstanding debts, obligations (including obligations as a guarantor) or liabilities of any nature of Company, whether absolute or accrued and, to Selling Stockholder's and Company's knowledge, Company has no material contingent debts, obligations or liabilities of any nature.

(b) Except as set forth on the Nevets Financial Statements, neither Selling Stockholder nor Company have any actual knowledge of any material outstanding debts, obligations (including obligations as a guarantor) or liabilities of any nature of Nevets, whether absolute or accrued and, to Selling Stockholder's and Nevets' knowledge, Nevets has no material contingent debts, obligations or liabilities of any nature.

**3.11 Books and Records. Intentionally Omitted.**

**3.12 Litigation**. There are no actions, suits, or proceedings pending, and to Selling Stockholder's, Company's and Nevets' knowledge no actions suits or proceedings threatened, against Company or Nevets or affecting the Company Stock or the Nevets Stock, before any federal or state court, or any governmental agency, nor are Selling Stockholder, Company or Nevets aware of any facts which, to their knowledge, might likely result in any such action, suit or proceeding.

**3.13 Intellectual Property**. To the knowledge of Company, the ownership and use by Company of any intellectual property used in the business of Company do not infringe any material rights of any third party. Company owns, is licensed under, or otherwise possesses sufficient rights to use all material intellectual property used in the business of Company.

**3.14 Insurance**.

(a) Company maintains and has maintained, without interruption since January 1, 2006, policies or binders of insurance covering risks and events in amounts adequate for its respective business and operations and customary in the industry in which it operates. There are no material claims by Company pending under any such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds or in respect of which such underwriters have reserved their rights. All premiums due with respect to such policies are currently paid and not subject to adjustment other than as a result of normal policy year audits.

(b) Nevets maintains and has maintained, without interruption since January 1, 2006, policies or binders of insurance covering risks and events in amounts adequate for its respective business and operations and customary in the industry in which it operates. There are no material claims by Nevets pending under any such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds or in respect of which such underwriters have reserved their rights. All premiums due with respect to such policies are currently paid and not subject to adjustment other than as a result of normal policy year audits.

**3.15 Personnel.**

(a) To the knowledge of Selling Stockholder and Company, there are no material actions, material labor disputes or, material grievances or investigations pending or, to knowledge of Selling Stockholder and Company, threatened relating to any labor, safety or discrimination matters involving any employee, including charges of unfair labor practices or discrimination complaints;

(b) To the knowledge of Selling Stockholder and Company, Company is in compliance in all material respects with all applicable laws respecting employment, employment practices, terms and conditions of employment and wages and hours. To the knowledge of Selling Stockholder and Company, Company is not liable for any material payment to any trust or other fund governed by or maintained by or on behalf of any governmental authority with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the ordinary course of

business). There are no pending or, to the knowledge of Selling Stockholder and Company, threatened material claims or material actions against Company under any worker's compensation policy.

(c) To the knowledge of Selling Stockholder and Nevets, there are no material actions, material labor disputes or, material grievances or investigations pending or, to knowledge of Selling Stockholder and Nevets, threatened relating to any labor, safety or discrimination matters involving any employee, including charges of unfair labor practices or discrimination complaints;

(d) To the knowledge of Selling Stockholder and Nevets, Nevets is in compliance in all material respects with all applicable laws respecting employment, employment practices, terms and conditions of employment and wages and hours. To the knowledge of Selling Stockholder and Nevets, Nevets is not liable for any material payment to any trust or other fund governed by or maintained by or on behalf of any governmental authority with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the ordinary course of business). There are no pending or, to the knowledge of Selling Stockholder and Nevets, threatened material claims or material actions against Nevets under any worker's compensation policy.

**3.16 Properties.**

(a) To the knowledge of Selling Stockholder and Nevets, Nevets has good and valid marketable title to all its material assets, tangible or intangible, including the Real Property, and such assets are owned free and clear of all liens, security interest and encumbrances, except: (a) as reflected in the Nevets Financial Statements; (b) as reflected on Schedule 3.16(a); and (c) liens for taxes and assessments not yet due and payable.

(b) To the knowledge of Selling Stockholder and the Company, the Company has good and valid marketable title to all its material assets, tangible or intangible, and such assets are owned free and clear of all liens, security interest and encumbrances, except: (a) as reflected in the Company Financial Statements; (b) liens for taxes and assessments not yet due and payable; and (c) Company's new and used car floor plan financing. Except for the Real Property and as set forth on Schedule 3.16(b) attached hereto and made a part hereof by this reference, Company does not lease any real or personal property. A copy of the lease by and between Company and Nevets covering the Real Property is attached hereto as a part of Schedule 3.16(b).

(c) Neither Selling Stockholder nor the Company makes any representation or warranty regarding the operating condition or repair of the Company's tangible personal property, which Buyer acknowledges it is buying "AS IS, WHERE IS".

**3.17 Related Party Transactions.**

(a) To the knowledge of Selling Stockholder and Company, Company has not, directly or indirectly, entered into any material agreement, commitment, arrangement, understanding, relationship or transaction, with any employee, officer, or director of Company, or any family member of any employee, officer or director of Company, except where the terms are "arms length" and no less favorable than if between Company and an independent third party.

(b) To the knowledge of Selling Stockholder and Nevets, Nevets has not, directly or indirectly, entered into any material agreement, commitment, arrangement, understanding, relationship or transaction, with any employee, officer, or director of Nevets, or any family member of any employee, officer or director of Nevets, except where the terms are "arms-length" and no less favorable than if between Nevets and an independent third party.

**3.18 Taxes.**

(a) To the knowledge of Selling Stockholder and the Company, the Company has: (i) duly and timely filed or caused to be filed all federal, state, and local tax returns required to be filed prior to the date of this Agreement which relate to Company or with respect to which Company or the assets or properties of Company are liable or otherwise in any way subject; (ii) paid or fully accrued, consistent with past practice, all taxes shown to be due and payable on such returns (which taxes, to Company's knowledge, are all the taxes due and payable under the laws and regulations pursuant to which such returns were filed), and (iii) for all such taxes accrued in respect of Company or the assets and properties of Company for period subsequent to the periods covered by such returns, accrued such taxes in a manner consistent with the past practice of Company. Selling Stockholder and Company further represent and warrant that their knowledge (i) no deficiency in payment of taxes for any period has been asserted by any taxing body and remains unsettled at the date of this Agreement; (ii) no extension of time for the assessment of deficiencies for any years is in effect; and (iii) they have no knowledge of any unassessed tax deficiency proposed or threatened against Company. Copies of all federal, state, and local tax returns of Company have been made available for inspection by Buyer. Company is, and has been for the ten-year period preceding Closing, an "S" corporation.

(b) To the knowledge of Selling Stockholder and the Nevets, Nevets has: (i) duly and timely filed or caused to be filed all federal, state, and local tax returns required to be filed prior to the date of this Agreement which relate to Nevets or with respect to which Nevets or the assets or properties of Nevets are liable or otherwise in any way subject; (ii) paid or fully accrued, consistent with past practice, all taxes shown to be due and payable on such returns (which taxes, to Nevets' knowledge, are all the taxes due and payable under the laws and regulations pursuant to which such returns were filed), and (iii) for all such taxes accrued in respect of Nevets or the assets and properties of Nevets for period subsequent to the periods covered by such returns, accrued such taxes in a manner consistent with the past practice of Nevets. Selling Stockholder and Nevets further represent and warrant that to the best of their knowledge (i) no deficiency in payment of taxes for any period has been asserted by any taxing body and remains unsettled at the date of this Agreement; (ii) no extension of time for the assessment of deficiencies for any years is in effect; and (iii) they have no knowledge of any unassessed tax deficiency proposed or threatened against Nevets. Copies of all federal, state, and local tax returns of Nevets have been made available for inspection by Buyer. Nevets is, and has been for the ten-year period preceding Closing, an "S" corporation.

**3.19 Environmental Matters**. To the actual knowledge of Selling Stockholder and Company, and except as disclosed on Schedule 3.19, Company, its properties and its operations are in compliance with all environmental permits, environmental agreements and environmental laws. To the actual knowledge of Selling Stockholder and Nevets, and except as disclosed on Schedule 3.19, the Real Property is in compliance with all environmental permits, environmental agreements and environmental laws. Except as may be disclosed on Schedule 3.19, Selling Stockholder, Company and Nevets have no any actual knowledge of any releases of Hazardous Materials (defined hereafter) in violation of applicable environmental laws on the Real Property. For purposes of this Agreement, "Hazardous Material" means (a) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls or (b) any chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant, contaminant or waste under any environmental law. To Selling Stockholder's, Company's and Nevets' best knowledge, there are no environmental claims pending or, to Selling Stockholder's, Company's or Nevets' knowledge, threatened, against Company, Nevets or the Real Property. To Nevets and Company's knowledge, Nevets and/or Company possess all material permits required under environmental law that are necessary for Company to occupy the Real Property and to operate as it currently operates. Nevets and/or Company, as the case may be, have provided or made available to Buyer true and accurate copies of all environmental reports, studies or assessments in the respective party's possession.

**3.20 No Brokers.** No broker, finder or similar agent has been employed by or on behalf of Company or Nevets, and no person with which Company or Nevets have had any dealings or communications of any kind is entitled to any brokerage commission, finder's fee or any similar compensation in connection with this Agreement or the transactions contemplated hereby.

**3.21 Subsidiaries.** Company and Nevets do not have any subsidiaries.

**3.22 Product Liability and Warranty.** Other than warranties regarding products manufactured in accordance with specifications or other warranties pursuant to applicable law, to the knowledge of Selling Stockholder and Company, no product sold or delivered by Company is subject to any material guaranty or warranty given by Company. To the knowledge of Selling Stockholder and Company, Company does not have any material liability arising out of any significant injury to any person or significant damage to any property as a result of the ownership, possession or use of any product manufactured, sold, leased or delivered by Company.

**3.23 Schedules.** The parties agree that any disclosure Schedules to be attached to this Agreement pursuant to this Article III may be attached hereto on or before the Closing Date.

## ARTICLE IV
## REPRESENTATIONS OF SELLING STOCKHOLDER

Selling Stockholder makes the following representations and warranties to Buyer, each of which shall be true on the date hereof and also at Closing:

**4.1 Title to Stock.**

(a) Selling Stockholder owns beneficially and of record, free and clear of any and all liens or encumbrances of any kind whatsoever, and has full power and authority to convey, free and clear of any and all liens or encumbrances of any kind whatsoever, the Company Stock, and, upon payment of the Purchase Price at the Closing as provided in ARTICLE II, Selling Stockholder will convey to Buyer good and valid title thereto, free and clear of any all liens or encumbrances of any kind whatsoever.

(b) Selling Stockholder owns beneficially and of record, free and clear of any and all liens or encumbrances of any kind whatsoever, and has full power and authority to convey, free and clear of any and all liens or encumbrances of any kind whatsoever, the Nevets Stock, and, upon payment of the Purchase Price at the Closing as provided in ARTICLE II, Selling Stockholder will convey to Buyer good and valid title thereto, free and clear of any all liens or encumbrances of any kind whatsoever.

**4.2 Capacity of Selling Stockholder; Enforceability.** Selling Stockholder has all requisite legal capacity and has taken all action necessary in order to execute, deliver and perform its obligations under this Agreement and each of the other agreements and instruments called for hereunder to which Selling Stockholder is a party and to consummate the transactions contemplated by this Agreement and each such other agreement. This Agreement and each of the each of the other agreements and instruments called for hereunder to which Selling Stockholder is a party have been duly executed and delivered by Selling Stockholder and constitute the legal, valid and binding obligation of Selling Stockholder, enforceable in accordance with their respective terms.

**4.3 Governmental Authorizations.** The execution, delivery and performance by Selling Stockholder of this Agreement and each of the other agreements and instruments called for hereunder to

which Selling Stockholder is a party do not, and the consummation by Selling Stockholder of the transactions contemplated hereby and thereby will not, require any permit, approval or order of, registration, declaration or filing with or notification to, any governmental entity.

**4.4** **Non-Contravention**. The execution, delivery and performance by the Selling Stockholder of this Agreement and each of the other agreements and instruments called for hereunder to which Selling Stockholder is a party do not, and the consummation by the Selling Stockholder of the transactions contemplated hereby and thereby will not (a) contravene, conflict with, or result in any violation or breach of, the articles of incorporation or bylaws (or comparable organizational instruments) of Company of Nevets, (b) contravene or conflict with, or result in any violation or breach of any laws, orders or permits applicable to Company or Nevets or by which any assets of Company or Nevets or Selling Stockholder are bound, (c) result in any violation or breach of, or constitute a default (with or without notice or lapse of time or both) under, any contract to which the Selling Stockholder is a party or by which any assets of any Company or Nevets bound, (d) require any consent, approval or other authorization of, or filing with or notification to, any person under any contract to which Selling Stockholder is a party or by which any assets of any of Company or Nevets are bound, (e) give rise to any termination, cancellation, amendment, modification or acceleration of any rights or obligations under any contract to which Selling Stockholder is a party or by which any assets of any of Company or Nevets are bound, or (f) cause the creation or imposition of any lien or encumbrance on any assets of any of Company or Nevets.

**4.5** **No Brokers**. No broker, finder or similar agent has been employed by or on behalf of Company or Nevets, and no person with which Company or Nevets have had any dealings or communications of any kind is entitled to any brokerage commission, finder's fee or any similar compensation in connection with this Agreement or the transactions contemplated hereby.

## ARTICLE V
## REPRESENTATIONS OF BUYER

Buyer makes the following representations and warranties to Selling Stockholder, each of which shall be true on the date hereof and also at Closing:

**5.1** **Organization and Standing**. **Intentionally Omitted**.

**5.2** **Authorization, Validity and Effect**. Buyer has all requisite corporate power and authority to enter into and perform his obligations under this Agreement and all the ancillary documents to which he is a party, and to consummate the transactions contemplated hereby and thereby, and this Agreement and such ancillary documents have been duly executed and delivered by Buyer pursuant to all necessary authorization and are the legally valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms.

**5.3** **No Brokers**. No broker, finder or similar agent has been employed by or on behalf of Buyer, and no person with which Buyer has had any dealings or communications of any kind is entitled to any brokerage commission, finder's fee or any similar compensation in connection with this Agreement or the transactions contemplated hereby.

## ARTICLE VI
## INDEMNIFICATION

**6.1 Survival of Representations and Warranties.** All of the representations, covenants, warranties, and agreements of the parties contained in this Agreement shall survive the execution and delivery hereof and Closing hereunder for a period of time equal to the applicable statute of limitations.

**6.2 Indemnification of Selling Stockholder by Buyer.** Buyer agrees to indemnify, defend and hold harmless Selling Stockholder from, against and in respect of the full amount of any and all liabilities, damages (excluding punitive damages except with respect to losses actually awarded to a third party in an action brought against Selling Stockholder), claims, deficiencies, assessments, losses (excluding losses of revenue and profits, and excluding consequential damages), penalties, interest, costs and expenses, including, without limitation, reasonable fees and disbursements of trial and appellate counsel arising from, in connection with, or incident to any inaccuracy or breach or violation of any of the representations, warranties, covenants or agreements of Buyer contained in this Agreement.

**6.3 Indemnification of Buyer by Selling Stockholder.** Selling Stockholder agrees to indemnify, defend and hold harmless Buyer, its successors and assigns, and officers, employees, directors, managers, members, partners and stockholders of each of the foregoing, and their heirs and personal representatives, from, against and in respect of the full amount of any and all liabilities, damages, claims, deficiencies, assessments, losses, penalties, interest, costs and expenses, including, without limitation, reasonable fees and disbursements of trial and appellate counsel (collectively, "Damages") arising from, in connection with, or incident to any material inaccuracy in or material breach or violation of any of the representations, warranties, covenants or agreements of Selling Stockholder, Company and/or Nevets contained in this Agreement.

**6.4 Claims for Indemnification.** A claim for indemnity pursuant to Article 6.2 or 6.3 of this Agreement may be made by any indemnified party at any time by the giving of written notice thereof to the indemnifying party. The notice shall set forth in reasonable detail the basis upon which the claim for indemnity is made.

**6.5 Indemnity Limitation.** Selling Stockholder's total aggregate liability under this Agreement shall, in all events, be limited to the amount of the Purchase Price, except for liabilities arising out of Sections 3.3 and 4.1 (Stock), 3.8 (Benefit Plans), 3.10 (Undisclosed Liabilities), 3.16 (Real Property), 3.18 (Taxes) and 3.19 (Environmental) which shall be without limit.

**6.6 Knowledge of Buyer.** Notwithstanding any statement contained herein to the contrary, in the event that Buyer has now or hereafter obtains prior to Closing actual knowledge that a representation, warranty, covenant and/or agreement of Company, Selling Stockholder or Nevets is not true and correct in any material respect, as a result of his operation of the subject business, Buyer shall not be entitled to pursue an indemnity claim against Selling Stockholder, Company or Nevets, as the case may be, in connection with the incorrect representation, warranty, covenant or agreement of which Buyer has obtained actual knowledge.

## ARTICLE VII
## COVENANTS OF THE PARTIES

**7.1 Maintenance of Business Prior to Closing.** During the period up to and including Closing, Company agrees to continue to carry on its business in the ordinary course and in accordance with past practice and to not take any action inconsistent therewith.

**7.2 Negotiations with Others.** Prior to Closing, or until this Agreement is terminated in accordance with its terms, neither Company, Nevets or Selling Stockholder or their agents or representatives shall, or shall cause or permit Company or Nevets to, directly or indirectly, solicit or initiate discussions or

engage in negotiations with, or provide information (other than publicly available information) to, or authorize any financial advisor or other person to solicit or initiate discussions or engage in negotiations with, or provide information to, any person (other than Buyer or Toyota Motor Company) concerning any potential sale of the Company Stock or the Nevets Stock, or merger, consolidation, sale of assets or other similar transaction involving Company or Nevets.

**7.3** **<u>Notification of Certain Matters</u>**. Selling Stockholder, Company and Nevets shall give prompt notice to Buyer and Buyer shall give prompt notice to Selling Stockholder, Company and Nevets, after becoming aware of (i) the occurrence, or failure to occur, of any event that would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date of this Agreement to Closing and (ii) any failure of Buyer, Selling Stockholder, Company or Nevets, as the case may be, to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. No such notification shall affect the representations or warranties of the parties or the conditions to their respective obligations hereunder.

**7.4** **<u>Commercially Reasonable Efforts; Cooperation</u>**. Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. The parties further agree to fully cooperate with one another in good faith in order to obtain the approval of Toyota Motor Corporation to the transaction contemplated hereunder, including without limitation, incorporating any reasonable revisions to this Agreement and/or any other agreements related to the contemplated transaction required by Toyota Motor Corporation.

**7.5** **<u>Access; Due Diligence</u>**. **Intentionally Omitted.**

## ARTICLE VIII
## <u>CONDITIONS TO CLOSING</u>

**8.1** **<u>Buyer's Conditions</u>**. Buyer's obligations under this Agreement are subject to fulfillment, prior to or at Closing, of each of the following conditions:

(a) All consents, authorizations, orders and approvals of, and filings and registrations with any governmental authority or any other person which are required for or in connection with the execution and delivery of this Agreement and the consummation by each party hereto of the transactions contemplated hereby, or which are required in order to avoid violation or termination of any material agreement, shall have been obtained or made.

(b) The representations and warranties of Company, Selling Stockholder and Nevets contained in this Agreement shall be true and correct in all material respects at and as of Closing, with the same force and effect as if made at and as of Closing; and Selling Stockholder, Nevets and Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them at or prior to Closing.

(c) No law shall have been enacted, entered, issued, promulgated or enforced by any governmental authority, nor shall any action be pending or threatened at what would otherwise be Closing, which prohibits or restricts or, (if successful) would prohibit or restrict, the transactions contemplated by this

Agreement or would not permit the business as presently conducted to continue unimpaired following Closing.

(d) The deliveries referred to in Section 2.2 shall have been made.

(e) Buyer shall have obtained financing, subject to terms and conditions satisfactory to Buyer, in a sufficient amount to allow Buyer to consummate the transaction contemplated herein.

(f) Approval from Toyota Motor Corporation ("Toyota") of the transactions contemplated in this Agreement shall have been obtained.

**8.2 Selling Stockholder's Conditions**. **Selling** Stockholder's obligations under this Agreement are subject to fulfillment, prior to or at Closing, of each of the following conditions:

(a) The representations and warranties of Buyer contained in this Agreement shall be true and correct at and as of Closing in all material respects, with the same force and effect as if made at and as of Closing; and Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it at or prior to Closing.

(b) The payments and deliveries referred to in Section 2.3 shall have been made.

(c) Approval from Toyota of the transactions contemplated in this Agreement shall have been obtained.

## ARTICLE IX
## NON-COMPETE

**9.1 Non-compete. Intentionally Omitted.**

## ARTICLE X
## TERMINATION

**10.1 Termination**. This Agreement may be terminated:

(a) By mutual written agreement of Selling Stockholder and Buyer;

(b) By Buyer, if any of the conditions set forth in Section 8.1 shall not have been fully satisfied, complied with or performed on or before Closing;

(c) By Selling Stockholder, if any of the conditions set forth in Section 8.2 shall not have been fully satisfied, complied with or performed on or before Closing; or

(d) By Buyer, on the one hand, or by Selling Stockholder on the other hand, if the Closing has not occurred on or before the date which is six (6) months after the date of this Agreement.

**10.2 Effects of Termination**. In the event of such termination, no party hereto shall have any liability to the other parties hereto or their respective stockholders or directors or officers in respect hereof. Nothing in this Section is intended to relieve any party from liability for misrepresentation under or any

breach of this Agreement prior to such termination or be deemed to constitute a waiver of any available remedy therefore.

## ARTICLE XI
## MISCELLANEOUS

**11.1** **Recitals.** The recitals preceding ARTICLE I above are hereby made a part of this Agreement and the parties agree and acknowledge the truth and accuracy of such recitals.

**11.2** **Modification; Waiver**. This Agreement cannot be modified or amended, or any of the terms hereof waived, except by an instrument in writing (referring specifically to this Agreement) executed by the party against whom enforcement of the modification, amendment, or waiver is sought.

**11.3** **Succession and Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other party; provided, however, that Buyer may assign its rights, interests, and obligations hereunder to any affiliate of Buyer, which shall be defined as an entity under common control or any member or shareholder of Buyer or entity under common control.

**11.4** **Counterparts.** This Agreement may be executed in one or more counterparts (including execution by facsimile signature), each of which shall be deemed an original but all of which together will constitute one and the same instrument.

**11.5** **Headings**. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**11.6** **Notices**. Every notice, approval, consent or other communication authorized or required by this Agreement shall be deemed served effective (i) upon delivery, if personally delivered; (ii) upon delivery to Federal Express or other similar courier service, marked for next day delivery, addressed as set forth below; (iii) upon receipt, if sent by registered or certified mail, return receipt requested, addressed as set forth below; or (iv) upon being sent by facsimile transmission, provided an original is mailed the same day by registered or certified mail, return receipt requested, addressed as set forth below. The notice addresses of the parties are:

If to Selling Stockholder:
Michael E. Steven
6631 East Kellogg
Wichita, Kansas 67207
Fax: (316) ____________________

If to Company:
Mike Steven Motors, Inc.
Attn: Brandon J.. Steven
7333 East Kellogg
Wichita, Kansas 67207
Fax: (316) ____________________

If to Nevets:
Nevets, Inc.
Attn: Brandon J. Steven

7333 East Kellogg
Wichita, Kansas 67207
Fax: (316) ____________________

in each case with a copy to:

Mark G. Ayesh
8100 East 22nd Street North, Bldg 2300
PO Box 781750
Wichita, Kansas
Fax: (316) 682-1729

If to Buyer:

Brandon J. Steven
7333 East Kellogg
Wichita, Kansas 67207
Fax: (316) __________________

with a copy to:

Hinkle Law Firm LLC
8621 East 21st Street North, Suite 200
Wichita, Kansas 67206
Attn: L. Dale Ward
Fax: (316) 630-8375

The customary registered/certified mail receipt or Federal Express or other courier receipt shall be evidence of such notice. Either party hereto may change the name and address of the designee to whom their notice shall be sent by giving written notice of such change to the other party hereto in the manner above provided at least ten (10) days prior to the effective date of such notice.

**11.7** **Invalid Provisions**. If any one or more of the provisions of this Agreement, or the applicability of any such provisions to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Agreement and all other applications of any such provision shall not be affected thereby.

**11.8** **Further Acts**. In addition to the acts recited in this Agreement to be performed by the parties, the parties agree to perform or cause to be performed any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

**11.9** **Miscellaneous**. As used in this Agreement, the masculine, feminine or neuter gender and singular or plural numbers shall each be deemed to include the other whenever the context so indicates. This Agreement shall be construed as a whole and in accordance with its fair meaning. With respect to this Agreement time is of the essence. If any date under this Agreement on which an event is to occur or notice is to be given falls on a Saturday, Sunday or federal holiday, then such date shall be the first business day following such Saturday, Sunday or federal holiday.

**11.10** **Attorneys' Fees**. If either party is required to enforce any of its rights under this Agreement, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees, court costs and other expenses incurred by the prevailing party in connection with the enforcement of those rights.

**11.11 <u>Governing Law</u>**. The laws of the State of Kansas shall govern the validity, enforcement and interpretation of this Agreement.

*[Signature page follows]*

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed as of the day and year first above written.

"NEVETS"

Nevets, Inc.

By: [signature]
Name: Michael E. Steven
Title: President
Date: 4-11-16

"SELLING STOCKHOLDER"

[signature]
Michael E. Steven
Date: ______

"COMPANY"

Mike Steven Motors, Inc.

By: [signature]
Name: Michael E. Steven
Title: President
Date: 4-11-16

"BUYER"

[signature]
Brandon J. Steven
Date: 4-11-16

**List of Schedules**

**Schedule 3.5(a) – Company Financial Statements**

**Schedule 3.5(b) – Nevets Financial Statements**

**Schedule 3.8 - Description of Benefit Plans**

**Schedule 3.16(a) – Real Property Title Exceptions**

**Schedule 3.16(b) - Leased Real or Personal Property**

**Schedule 3.19 – Environmental Matters**

**UNANIMOUS WRITTEN CONSENT ACTION**
**IN LIEU OF SPECIAL MEETING OF THE SHAREHOLDER**
**OF**
**MIKE STEVEN MOTORS, INC.**

The undersigned, being the sole shareholder of **MIKE STEVEN MOTORS, INC.,** a Kansas corporation (the "Corporation"), does hereby, pursuant to the provisions of the Kansas General Corporation Code, waive notice of the time and place of a special meeting of the Shareholders of the Corporation and consents to and approves the following resolutions, to have the same force and effect as if unanimously adopted at a regular meeting of the Shareholders of the Corporation duly held as of the date hereof.

WHEREAS, on even date herewith the Corporation has redeemed all of the stock of the Corporation owned by Michael E. Steven such that Brandon J. Steven is the Corporation's sole stockholder; and

WHEREAS, the Shareholder desires to elect Brandon J. Steven to serve as the sole Director of the Corporation.

NOW THEREFORE,

BE IT RESOLVED, that Brandon J. Steven is elected to the Board of Directors of the Corporation, to serve until the next annual meeting of the Shareholders of the Corporation, or until his successor has been duly elected and qualified, or until his earlier death, resignation or removal.

The undersigned certifies that he is the sole Shareholder of the Corporation and is entitled to vote on the foregoing matters and hereby consents and agrees to the foregoing resolution.

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written Consent Action to be filed as part of the records of the Corporation as of this 28 day of June, 2016.

______________________________
Brandon J. Steven, Shareholder

**UNANIMOUS WRITTEN CONSENT ACTION**
**IN LIEU OF SPECIAL MEETING OF THE DIRECTOR**
**OF**
**MIKE STEVEN MOTORS, INC.**

The undersigned, being the sole director of **MIKE STEVEN MOTORS, INC.,** a Kansas corporation (the "Corporation"), does hereby, pursuant to the provisions of the Kansas General Corporation Code, waive notice of the time and place of a special meeting of the Directors of the Corporation and consents to and approves the following resolutions, to have the same force and effect as if unanimously adopted at a regular meeting of the Directors of the Corporation duly held as of the date hereof.

WHEREAS, the director desires to elect Brandon J. Steven to serve as the officers of the corporation.

NOW THEREFORE,

BE IT RESOLVED, that Brandon J. Steven is elected to serve as the president, director, and secretary of the Corporation, to serve until the next annual meeting of the Directors of the Corporation, or until his successor has been duly elected and qualified, or until his earlier death, resignation or removal.

The undersigned certifies that he is the sole Director of the Corporation and is entitled to vote on the foregoing matters and hereby consents and agrees to the foregoing resolution.

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written Consent Action to be filed as part of the records of the Corporation as of this 28 day of June, 2016.

Brandon J. Steven, Director

## OWNERSHIP AMENDMENT TO TOYOTA DEALER AGREEMENT

Agreement by and between Mike Steven Motors, Inc. (Dealer Entity Name), located at 7333 East Kellogg (Address) Wichita, Kansas (City, State)

a(n) Corporation (Individual/Partnership/Corporation/Limited Liability Company), hereinafter called DEALER, and

Toyota Motor Sales, U.S.A., Inc. (Distributor), hereinafter called DISTRIBUTOR.

In consideration of the mutual covenants of the parties hereto, and other good and valuable consideration, DISTRIBUTOR and DEALER hereby agree that Paragraph IV (Ownership of Dealership) of the Toyota Dealer Agreement entered into between them on August 6, 2015, and previously amended on n/a, is hereby amended to read as follows:

### IV. OWNERSHIP OF DEALERSHIP

This Agreement is a personal service Agreement and has been entered into by DISTRIBUTOR in reliance upon and in consideration of DEALER's representation that only the following named persons are the Owners of DEALER, that such persons will serve in the capacities indicated, and that such persons are committed to achieving the purposes, goals and commitments of this Agreement:

| OWNERS' NAMES | TITLE | PERCENT OF OWNERSHIP |
|---|---|---|
| Brandon Steven | President Dealer Principal | 100% |
| | | |
| | | |
| | | |
| | | |
| | | |

Mike Steven Motors, Inc. , DEALER
(Dealer Entity Name)

Date: 7-5-16 By: [signature] (Signature) Brandon Steven President (Title)

Date: ______ By: ______ (Signature) ______ (Title)

Toyota Motor Sales, U.S.A., Inc. , DISTRIBUTOR
(Distributor)

Date: 7/5/16 By: [signature] (Signature) Wylon L. Harper General Manager (Title)

APPROVED: TOYOTA MOTOR SALES U.S.A., INC.

Date: JUL 07 2016 By: [signature] (Signature) President (Title)